**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-425 (APM)** |
| **v.** | : | |
| | : | |
| **MARISSA LEE BOWLING,** | : | |
| **DYLAN BOWLING,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Codefendants Marissa and Dylan Bowling have pled guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Marissa Bowling to 14 days incarceration on Count One and 24 months' probation on Count Two, and Dylan Bowling to 21 days incarceration on Count One and 24 months' probation on Count 2. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution for both defendants.

**I.      Introduction**

Marissa Bowling, 30, and her husband Dylan Bowling, 33, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

For their actions, they each plead guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). The government's recommendation is supported by the codefendants' (1) preparation for a riot at the U.S. Capitol building by donning gas masks and goggles and (2) climbing through a broken window adjacent to the Senate Wing Door to enter the United States Capitol building; (3)  lying to law enforcement officials in the wake of January 6 that they didn't enter the Capitol building; and (4) failure to express remorse for their criminal conduct on January 6. Additionally, Dylan Bowling used a bullhorn to encourage a law crowd of rioters to breach the Capitol building through the Senate Wing Doors.

The Court must also consider that the Bowlings' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of the Bowlings' crime support a sentence of 14-21 days incarceration and 24 months of probation in this case.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.        Factual and Procedural Background

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1.

On January 5, 2021, codefendants Marissa Bowling and her husband, Dylan Bowling, travelled to Washington D.C. from their home in Alabama to protest the results of the 2020 election. Records obtained during the investigation show they rented a hotel room in the city from January 5-7, 2021. Their plans included attending the "Stop the Steal" rally at the Ellipse on the morning of January 6. However, it is clear, based on their attire, that they planned to participate in much more than just a peaceful protest. Both Marissa and Dylan Bowling came prepared with respirator face masks which protected their noses and mouths, as well as goggles to protect their eyes. Dylan Bowling brought a megaphone and a flagpole. On January 6, 2021, they attended former President Trump's "Stop the Steal" rally, near the Ellipse. After the rally, they walked together toward the United States Capitol.

The Bowlings approached the grounds from the west, where they joined a large and hostile group on the Lower West Terrace. As they approached the Capitol building, they observed large crowds of rioters scaling scaffolding (erected for the inauguration), donning protective gear, shouting, and waving flags.



*Image 1: A photograph obtained from Marissa Bowling's Google Account depicting the temporary scaffolding on the west side of the US Capitol on January 6, 2021.*

Both Bowlings also wore protective gear, which included respirator style air masks and goggles.  They carried backpacks and Dylan Bowling held a bullhorn and a flag on a pole.

 

*Image 2: A screenshot from Exhibit 1 of Dylan Bowling (Left) and Marissa Bowling (right) wearing respirator masks and goggles on January 6, 2021, as they stand on the Upper West Terrace.*

The Bowlings next made their way to the Upper West Terrace, where they approached the Senate Wing Doors.  Around this time, large crowds of rioters were forming outside those doors. Dylan Bowling used his megaphone to encourage them, shouting, "Keep pushing forward!"  *See Exhibit 1.*  Video obtained from Marissa Bowling's Google account showed that the Senate Wing Door area was a chaotic scene.  The door itself had been breached, and rioters appeared to be throwing items through the door.  A hazy smoke hung in the air as people attempted to cover their faces with clothes and scarves.  Multiple rioters climbed through a broken window to gain access to the building.  *See Exhibit 1.*

At approximately 2:49 p.m., Marissa and Dylan Bowling entered the United States Capitol through a broken window near the Senate Wing Door.  Amongst a large mob of people, they

marched through the Crypt, by the Memorial Door, and proceeded through the House Wing Corridor.



*Image 3: A screenshot from CCTV from the US Capitol showing Dylan Bowling and Marissa Bowling (red circle) walking through the House Wing Corridor.*

The Bowlings then reversed course and walked back to the Crypt where they took photos and videos.  Videos from Marissa Bowling's Google account show that the crowd of rioters in the Crypt were waving flags and chanting, "USA!"  After remaining in the Crypt for approximately 10 minutes, the Bowlings walked back toward the Senate Wing Doors, where they exited the building through the same broken window through which they entered.  In total, the Bowlings spent approximately 25 minutes inside of the Capitol.

During the investigation of this crime, Marissa and Dylan Bowling voluntarily spoke to FBI agents on multiple occasions. Both Bowlings lied during their interviews. On July 21, 2021, Dylan Bowling told investigators that he went to Washington D.C. on January 6 and attended the "Stop the Steal" rally. He denied going inside of the Capitol. Two days later, July 23, 2021, Dylan Bowling doubled down on his statements, telling investigators that he attended the rally with his wife, Marissa, and that when they started walking toward the Capitol, they heard loud "booms," turned around, and went back to their hotel. He again denied entering the Capitol.

On October 20, 2021, Marissa Bowling spoke to investigators. She agreed that she went to the rally in Washington D.C. with her husband, Dylan. However, she also denied entering the Capitol and repeated Dylan's story that they heard loud "booms" and went back to their hotel. Marissa further stated that she wore a black coat, black hat, and a gray scarf to the rally. This is directly contradicted by the photos which show her wearing a pink jacket, a gray hat, and a gray scarf on January 6. Finally, Marissa told investigators there had been technological problems with her phone, and that the geographic data it captured was inaccurate. Again, this was demonstrated false by photos and videos which showed Marissa Bowling using a phone to take photos and videos at the U.S. Capitol on January 6, as well as a search of her Google accounts which produced photos and videos taken by Marissa Bowling on January 6.

On December 6, 2023, the United States charged both Marissa and Dylan Bowling by a four-count Information with violating 18 U.S.C. 1752(a)(1) and (a)(2) and 40 U.S.C. 5104(e)(2)(D) and (e)(2)(G). On March 14, 2024, pursuant to plea agreements, both Marissa and Dylan Bowling pleaded guilty to Counts 3 and 4 of the Information, charging them with violations of 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). In those plea agreements, both co-defendants agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

The Bowlings now face sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). As noted by the plea agreements and the U.S. Probation Office, the Bowlings face up to six months of imprisonment and a fine of up to $5,000. The defendants must also pay restitution under the terms of the plea agreements. *See* 18 U.S.C.  § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As the offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In these cases, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration and 24 months of probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Marissa Bowlings' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like the Bowlings, the absence of violent or destructive acts is not a mitigating factor. Had the Bowlings engaged in such conduct, they would have faced additional criminal charges.

There are two important factors to consider in the Bowlings' case.  First, they went to the United States Capitol on January 6 prepared for the violence. Both Bowlings came to Washington,

D.C. prepared for an altercation—with goggles and respirators. Their preparations reveal an intent to involve themselves in a potentially violent situation.  And their conduct that day shows their intent come to fruition. When approaching a large crowd of rioters who had breached the Senate Wing Doors, Marissa Bowling documented the chaos. Dylan Bowling responded to the violence by encouraging the crowd through his megaphone to "Keep pushing forward!"

Second, despite voluntarily speaking to FBI agents after participating in the violent uprising at the Capitol, both Bowlings told synchronized lies to the agents about the events of that day.  In his interview in October 2021, Dylan admitted that he travelled to Washington D.C., but denied going to the Capitol, and explicitly told investigators he and his wife, Marissa, walked toward the Capitol, but turned around after hearing loud booms coming from that area.  This lie was parroted several months later by Marissa Bowling when she too was interviewed. She also doubled down—making up an absurd lie about the accuracy of her phone, which was easily proven false by the fact that photos and video show her using a cell phone inside of the Capitol building.

Accordingly, the nature and the circumstances of this offense warrant a sentence of 14 days and 24 months' probation in this matter.

### B.  The Bowlings' Histories and Characteristics

Unlike many criminal defendants who come before this Court, Marissa Bowling presents no significant mitigating factors.  As set forth in the PSR, Bowling grew up in a stable household, (Marissa PSR ¶¶ 43-44), graduated high school. (Marissa PSR ¶ 53), has no history of mental illness or substance abuse, (Marissa PSR ¶ 51-52), and does not report any debilitating physical conditions, (Marissa PSR ¶ 50).  She has no criminal history, nor any criminal affiliations. (Marissa PSR ¶¶ 35-41, 49).  She has a stable life, with a home in Alabama where she resides with her husband and stepson.  (Marissa PSR ¶¶ 45, 47).  She is employed.  (Marissa PSR ¶¶ 45, 56).

Aside from two juvenile adjudications which occurred almost two decades ago, Dylan Bowling's history and characteristics also present well.  Though Dylan Bowling describes a history of serious physical injuries in his past, (Dylan PSR ¶¶ 63-67), both he and his mother describe his upbringing and current familial relationships as happy ones, (Dylan PSR ¶¶ 50-55).  Like his wife, Dylan Bowling's history reveals no significant mitigating factors.  Dylan Bowling graduated high school, (Dylan PSR ¶ 53), and is successfully self-employed, (Dylan PSR ¶ 79).  He is currently in healthy physical condition and has no history of debilitating mental health issues, (Dylan PSR ¶¶ 58, 70-71).

Like his wife, Dylan Bowling leads a stable life, and owns the home in Alabama where he and Marissa live with his son.  (Dylan PSR ¶¶ 56-58).   In sum, there is nothing in either Dylan nor Marissa Bowling's personal history or characteristics which mitigates their sentences under § 3553(a).

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

Both Marissa and Dylan Bowling accepted responsibility by pleading early in this matter. Neither, however, have to date expressed remorse for their criminal conduct, which is a very different thing. Moreover, the Bowlings effectively doubled down and demonstrated a contempt for the law by coordinating a series of lies to the FBI agents about their criminal conduct. None of this bodes well for the likelihood that they would reoffend if faced with another disappointing election.  This Court should impose a sentence that is sufficient to deter them from recidivism. A sentence that does not include a period of incarceration is unlikely to do so.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence the Bowlings based on their conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: enthusiastic participation in the January 6 riot.

Marissa and Dylan Bowling plead guilty to Counts 3 and 4 of the criminal Information. These are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, one case previously sentenced before this Court does present an especially similar example.  In *United States v. Zachary and Kelsey Wilson,* 21-CR-578 (APM), the co-defendants were also a married couple. They traveled from Missouri to Washington D.C. to attend the "Stop the Steal" rally.  Like the Bowlings, they walked to the United States Capitol grounds, where they entered the restricted grounds from the west, traversed over the West Terraces and approached the Senate Wing Doors.  Like the Bowlings, the Wilsons entered the building through a broken window near the Senate Wing Doors, entering only a few minutes before the Bowlings.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Like the Bowlings, the Wilsons walked through the Crypt, and the House Corridor. Unlike the Bowlings, the Wilsons also entered former Speaker Pelosi's Office.  Like the Bowlings, the Wilsons were also in the building for approximately 20 minutes.  When interviewed by the FBI, Kelsey Wilson gave false statements, and denied entering the Capitol, though admitted being on the grounds.

The Wilsons both pled guilty to one count of Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This Court sentenced each of them to 24 months' probation to include a 45-day period of home detention for Zachary Wilson, a 30-day period of home detention for Kelsey Wilson, and 60 hours of community service for each. *Wilson*, 21-CR-578, ECF Nos. 60, 62.  At sentencing, the government advocated for 14 days of incarceration for each of the Wilsons with 36 months of probation.  However, as the Court correctly concluded, the disparity between the Wilsons' behavior did merit different lengths of detention. Correspondingly, the government in this case seeks to recognize those differences and therefore believes that 21 days for Dylan Bowling, an additional week beyond Marissa Bowling's sentence, is warranted here.

While the government recognizes the significant similarities between the Bowlings and the Wilsons, there is a significant additional aggravating factor in the Bowlings' case.  Both Marissa and Dylan Bowling showed significant preparation in coming to the United States Capitol on January 6 wearing air respirators and eye goggles.  Unlike the Wilsons, the Bowlings evidenced a clear intent to participate in the riotous and violent insurrection that occurred on January 6.  And Dylan Bowling, unlike either Wilson, actively encouraged other rioters to breach the Capitol building. Marissa Bowling recorded the chaos and then pushed inside the building with her husband. This makes their conduct significantly worse than the Wilsons'.

13

Consideration of a defendant's preparedness and the use of tactical/protective gear is a well-documented factor which has been considered by the vast majority of judges in the January 6 context. For example, in *United States v. Reed¸* 21-CR-204 (BAH), the defendant pled guilty to one misdemeanor pursuant to 18 U.S.C. § 1752(a)(1). The court sentenced Reed to 36 months probation with 42 days of intermittent confinement, and 3 months of home detention, 21-CR-204 (BAH) (ECF No. 177), emphasizing the fact that defendant brought a respirator mask and ski goggles with him, showing he anticipated violence and chemical irritants. Likewise, in *United States v. Kramer*, 21-CR-413 (EGS), the defendant pled guilty to a misdemeanor under 40 U.S.C. § 5104(e)(2)(G). Judge Sullivan imposed 30 days incarceration and 100 hours of community service, 21-CR-413 (EGS) (ECF No. 34), identifying the fact that the defendant brought a helmet and cane to the Capitol which was consistent with an expectation of violence. In *United States v. Perretta, et al*, 21-CR-539 (TSC), both Perretta and his codefendant Vukich, pled guilty to one misdemeanor pursuant to 40 U.S.C. § 5104(e)(2)(G). The court sentenced both codefendants to 30 days incarceration,  21-CR-539 (TSC) (ECF Nos. 62, 64), citing the fact that both codefendants prepared for the attack by bringing goggles and eye protection with them.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that both Marissa and Dylan Bowling must pay $500 in restitution, which reflects in part the role that they each played in the riot on January 6.[4] Plea Agreement at ¶

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The Bowlings' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 86.

## VI.    Fine

The Bowlings' convictions subject them to a statutory maximum fine of not more than $5,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the codefendants' financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Marissa Bowling to 14 days incarceration and 24 months' probation, and Defendant Dylan Bowling to 21 days incarceration and 24 months' probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Marissa and Dylan Bowling's liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for this crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Allison K. Ethen*
Allison K. Ethen
Assistant United States Attorney
Capitol Siege Detailee
MN Bar No. 0395353
300 South Fourth Street
Minneapolis, MN 55415
612-664-5575

## <u>CERTIFICATE OF SERVICE</u>

On this 12th day of July, 2024, a copy of the foregoing was served on counsel of

record for the defendant via the Court's Electronic Filing System.

<u>            /s/*Allison K. Ethen*             </u>
Allison K. Ethen
Assistant United States Attorney